UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

AARON HAHN,

          Plaintiff,

v.

DOUG WADDINGTON, et al,

          Defendants.

Case No. 3:14-cv-05047-RJB-TLF

REPORT AND RECOMMENDATION

Noted for September 7, 2018

This matter is before the Court on defendants' motion for summary judgment. Dkt. 85. Plaintiff Aaron Hahn has filed a lawsuit under 42 U.S.C. § 1983, alleging the named defendants were deliberately indifferent to his health and safety in violation of his Eighth Amendment rights. Dkt. 19. Specifically, Mr. Hahn alleges defendants placed him in close custody at the Washington State Penitentiary ("WSP"), located in Walla Walla, Washington, despite knowing about his mental health concerns and his fears about being sent to WSP.

This matter has been referred to the undersigned Magistrate Judge. *Mathews, Sec'y of H.E.W. v. Weber*, 423 U.S. 261 (1976); 28 U.S.C. § 636(b)(1)(B); Local Rule MJR 4(a)(4). In their motion for summary judgment, defendants argue defendants Doug Waddington and Scott Russell should be dismissed based on lack of personal participation. Defendants also argue Mr. Hahn has failed to state a valid Eighth Amendment claim against defendant Robert Martin, and that Mr. Martin is entitled to qualified immunity.

REPORT AND RECOMMENDATION - 1

1    The Court should grant the defendants' motion, because plaintiff fails to establish Mr. Waddington and Mr. Russell personally participated in the harm alleged, and fails to state a valid Eighth Amendment claim against Mr. Martin. Mr. Martin is also entitled to qualified immunity.

## I.    FACTUAL AND PROCEDURAL HISTORY

Mr. Hahn, who currently is an inmate at the Stafford Creek Corrections Center, arrived at the Washington Corrections Center ("WCC"), located in Shelton, Washington, on December 2, 2009, following a conviction for solicitation of murder in the first degree. Dkt. 19, Complaint, p. 7; Dkt. 94, Attachment C, Custody Review for Inmate Aaron Michal Hahn p. 45. The Washington State Department of Corrections ("DOC") receives convicted male offenders, as their first placement, at WCC where admission and orientation is conducted. Dkt. 88, p. 2.

The WCC's Reception Diagnostic Center ("RDC") obtains information for each inmate who is committed to the DOC "in order to provide necessary assistance during incarceration." Dkt. 94, Attachment A, DOC Policy 310.150, p. 3. The information obtained is "used for risk and needs assessment, to develop a Custody Facility Plan, and to provide the [DOC] with the necessary information concerning the offender." *Id.*

The RDC uses "objective Initial Classification processes" to assign each inmate a custody level, so as to place that inmate "in the least restrictive facility while providing for the safety of the community, staff, and offenders." *Id.*; Dkt. 88, Declaration of John Campbell, p. 2. This system is designed to help inmates understand how their criminal history and conduct affects their custody designation and facility placement. *Id.*

When an inmate arrives at WCC, he is assigned a "Classification Counselor" for his initial classification and is "screened and assessed." Dkt. 88, p. 2. The inmate also undergoes "a cursory medical and mental health screening to determine if there [are] any issues that require an

immediate follow up with a provider." *Id.* In addition, the inmate is fingerprinted, photographed, observed for scars, marks, and tattoos, and then given a housing assignment in one of WCC's reception units. *Id.*

John Campbell, a DOC Classification and Case Management Administrator, describes the initial mental health screening as follows:

> An initial mental health screening is completed by mental health professionals to identify mental health needs. Offenders who are identified through this process as developmentally disabled or seriously mentally [sic] will be referred by mental health staff for placement. The highest priority seriously mentally ill offenders are referred for placement in specialized units. These specialized placement referrals are identified and initiated by mental health without involvement by the classification counselor. Offenders who may need mental health services but do not rise to the level of a specialized seriously mentally ill are identified through this process and health services staff enter a particular numeric code into [DOC's Offender Management Network Information (OMNI) database], which informs their facility placement according to the level of services available based on need. This process is carried out by mental health providers under DOC Policy 630.150.

Dkt. 88, pp. 2-3.

In addition to the mental health screening, inmates "undergo an initial classification interview by their assigned Classification Counselor at which time their custody score/level is calculated." *Id.* at p. 3. This initial classification takes into consideration the inmate's age, crime category, and history of violence, as well as any detainers and escapes. *Id.* A custody review score in the range of 0-34 points "requires placement at [a] Level 4 facility (close custody)." *Id.*

Upon being assigned a custody review score, inmates "are assigned to a custody level and a Custody Facility Plan is drafted." Dkt. 88, p. 3. The Custody Facility Plan is then "submitted to the Correctional Unit Supervisor (CUS) for review at the [inmate's] facility and is then sent to DOC Headquarters Classification where the final custody level is assigned and facility placement is determined." Dkt. 88, p. 3. However, Classification Counselors and Custody Unit Supervisors

REPORT AND RECOMMENDATION - 3

1  do not make inmate facility placement decisions. *Id.* at p. 4.

2      Mr. Martin was Mr. Hahn's assigned Classification Counselor when Mr. Hahn arrived at
3  WCC on December 2, 2009. Dkt. 86, Declaration of Robert Martin, p. 1. Mr. Martin states he
4  followed DOC Policy 310.150 Reception, Initial Classification and Custody Facility Plan and
5  DOC Policy 300.380 Classification and Custody Facility Plan Review when he began Mr.
6  Hahn's initial classification process. *Id.* at pp. 1-2.

7      Mr. Martin states that after gathering all of Mr. Hahn's information – including Mr.
8  Hahn's criminal information and Mr. Hahn's mental health assessments and screenings, which
9  were completed by WCC mental health staff – he scheduled an interview with Mr. Hahn. Dkt.
10 86, p. 2. Mr. Martin states that "[t]hrough this process," he asked Mr. Hahn a series of questions
11 about his criminal, educational, and family history. *Id.*

12     According to Mr. Martin, shortly after the interview Mr. Hahn submitted several "Kiosk"
13 email messages regarding his facility placement and cellmate requests. Dkt. 86, p. 2. One such
14 email dated December 18, 2009, reads: "TO WALLAWALLA WHEN I SEE YOU SOON I
15 WILL EXPLAIN WHY." Dkt. 19, p. 18. A second one dated December 19, 2009, reads: "JUST
16 SEND ME ANYWHERE BUT I DO HAVE QUESTIONS AND A CELLY REQUEST." *Id.*

17     On December 18, 2009, Mr. Martin gave Mr. Hahn a custody score of 22, by considering
18 his age, current crime of solicitation of murder in the first degree, criminal history of sexual
19 exploitation of a minor, and a felony detainer in Oregon for domestic violence assault. Dkt. 86,
20 p. 2; Dkt. 88 p. 4. According to Mr. Campbell, who at the time of Mr. Hahn's entry into DOC
21 custody was the WCC Custody Unite Supervisor, Mr. Martin correctly calculated Mr. Hahn's
22 custody score. Dkt. 88, p. 4.

23     Mr. Campbell reviewed Mr. Hahn's custody facility plan and custody score, and because

24

25

of Mr. Hahn's mental health issues recommended that Mr. Hahn be placed at WSP. Dkt. 88, p. 4. Mr. Hahn's mental health records showed he had "mental health needs," but "was not a proper candidate for a seriously mentally ill placement." *Id.*; Dkt. 95, Attachment A, Intersystem Intake Screenig, p 3, Attachment B, Intersystem Mental Health Screening, p. 5, Attachment C, Mental Health Appraisal, pp. 7-11, Attachment E, treatment records, pp. 17-23, 26-28, 31.

Washington State Penitentiary and Clallam Bay Corrections Center ("CBCC") are the only DOC facilities with close custody units. Dkt. 88, p. 4. And because WSP is the only DOC facility that accommodates inmates with mental health issues, that facility was determined to be the appropriate placement for Mr. Hahn. *Id.* Pursuant to DOC Policy 310.150, however, the determination regarding Mr. Hahn's final facility placement had to be made by the DOC Headquarters Chief of Classification. *Id.*

On December 22, 2009, Mr. Martin sent a Kiosk email to Mr. Hahn stating: "You were put in for WSP." Dkt. 19, p. 18. That same day, Mr. Martin sent another email stating: "I don't do celly request [sic] but if you have an issue contact the Unit Sgt. or CUS." *Id.* Later that day, Mr. Hahn emailed Mr. Martin stating: "OK THAT IS FINE I REALLY DO NEED TO GO TO CBCC WSP WILL NOT WORK PLEASE MAKE CBCC WORK." *Id.*

On December 23, 2009, the DOC Headquarters' Classification Unit received a letter dated December 18, 2009, from Mr. Hahn regarding concerns and questions he had concerning his classification. Dkt. 94, Attachment D, letter from Mr. Hahn dated December 18, 2009, p. 49. Mr. Hahn complained that Mr. Martin had: asked him "very inappropriate" questions; used criminal charges "that got dropped" to classify him; "assumed a lot of things"; and did not let him answer the questions he was asked. *Id.*

Mr. Hahn also complained in the letter about having a custody score that placed him in

REPORT AND RECOMMENDATION - 5

1    close custody, meaning that he could only go to WSP or CBCC. Dkt. 94, p. 49. Specifically, Mr.

2    Hahn stated that his family was from the Portland area, which likely would be too far away from

3    either facility for his family to visit. *Id.* at pp. 49-50. He stated this would make it "extremely

4    stressful" for him and cause his mental health issues to increase. *Id.* at p. 50.

5         On December 28, 2009, someone from the Headquarters' Classification Unit responded

6    to Mr. Hahn's letter, informing him that "[r]equests for custody override or requests for specific

7    facility placement must be addressed in the development of your Initial Custody Facility Plan

8    (CFP), working with your Classification Counselor." Dkt. 94, Attachment D, letter from Kevin

9    Bowen, Correctional Specialist 4, dated December 28, 2009, p. 48. Mr. Hahn also was informed

10   that "[y]ou have the right to appeal your initial custody assignment to the Chief of Classification

11   after it has been *finalized* by Headquarters' Classification Unit," but that he could not appeal his

12   facility placement. *Id.* (emphasis in the original).

13        On December 31, 2009, Mr. Hahn sent a Kiosk email to Mr. Martin stating: "MIKE

14   ARMSTRONG WILL BE HERESOON [sic] I DONT [sic] WANT HIM BY ME." Dkt. 19, p.

15   18. On January 1, 2010, Mr. Hahn sent another email stating: "IT IS OK IF I DO NOT HAVE A

16   SEPARATE WITH NORRMAN LIVINGOOD BUT I DO WANT ONE WITH MIKE

17   ARMSTRONG." *Id.* Later that day, Mr. Martin responded: "DOC has over 6 Mike Armstrongs,

18   you will have to find out his middle name or have [sic] number." *Id.* at p. 19.

19        It does not appear that Mr. Hahn further responded to Mr. Martin regarding this particular

20   separation concern. On January 2, 2010, as WCC's Correctional Unit Supervisor, Mr. Campbell

21   approved the Custody Facility Plan Mr. Martin had created for Mr. Hahn. Dkt. 88, p. 5.

22        Over the course of January 3 and 4, 2010, Mr. Hahn sent Mr. Martin several Kiosk emails

23   concerning to how his custody score was calculated, particularly in regard to the Oregon

24

25

detainer/warrant he had. Dkt. 19, pp. 18-19. Also on January 4, 2010, Mr. Hahn emailed Mr. Martin asking "WHAT IS MENTA- HEALTH COURT\??" *Id.* at p. 19.

Mr. Martin responded the next day, stating: "I don't know what you are talking about? I have never heard of mental health court. Are you talking 'Civil Commitment' or 'Criminally Insane' sentence?" Dkt. 19, p. 19. The following day, Mr. Hahn replied: "I HAVE NO IDA [sic] I HEARD IT FROM AN ONMATE [sic]." *Id.*

Plaintiff states in his complaint that on January 10, 2010, he asked Mr. Martin if he "could be placed in Mental Health," in regard to which Mr. Martin – according to Mr. Hahn – informed him that he "did not qualify for Mental Health." Dkt. 19, p. 8. Mr. Hahn further states that on or about January 12, 2010, he "saw the Mental Health prescriber" and told that prescriber that he "was scared to go to Walla Walla," to which that prescriber apparently responded: "What you can't fight?" *Id.* at p. 9.

Plaintiff also states in his complaint that on January 15, 2010, he "was slashed on the lip by an unknown inmate," and that Mr. Martin was aware of this incident because Mr. Hahn told him about it on January 27, 2010. *Id.* Mr. Martin for his part states that Mr. Hahn did not express to him "any concerns for his personal safety," and that he did not have any reason to believe that Mr. Hahn would be at risk if transferred to WSP. Dkt. 86, p. 2.

On January 20, 2010, the Headquarters' Classification Unit assigned Mr. Hahn to close custody at WSP. Dkt. 88, p. 5.

On February 1, 2010, plaintiff was seen by A Kohl LFT, Psychology Associate, who reported as follows:

> Mr. Hahn was seen at the request of medical as he reported that he had thoughts of self harm. When questioned he stated that he was depressed, scared, and paranoid. He stated that he is worried about going to closed custody because he gets beat up. He reported that he was out a few weeks ago

REPORT AND RECOMMENDATION - 7

1  and had to have his lip stitched up and now he is afraid he will be killed. He
   feels he cannot make it in closed custody. He stated that he doesn't [sic] well
2  in these types of settings and has been assaulted now three times. He was
   attacked once in county jail during his 20 month stay there and how twice
3  here. He is afraid he will get beat up in closed custody. He states he can't go
   to protective custody because he gets board [sic] and he ends up "hearing
4  things and doing thing". But he didn't know what when asked to explain.

5  Dkt. 95, p. 36.

6  Mr. Hahn was transferred to WSP on or about February 14, 2010. Dkt. 19, p. 9. In a letter

7  dated March 4, 2010, that was received by the Headquarters' Classification Unit on March 15,

8  2010, Mr. Hahn stated that "being at Walla Walla is not the issue, being in closed custody is."

9  Dkt. 94, Attachment E, letter from Mr. Hahn dated March 4, 2010, p. 53. Mr. Hahn went on to

10 state: "I am around a lot of lifers and murderers and convicts and I am none of these." *Id.*

11 Mr. Hahn further stated in the letter that "I argued with my counselor at Shelton over this

12 and he told me there was only this option for me and there was no way I would get an override,"

13 and that his counselor would not put him in for an override. Dkt. 94, p. 53. Mr. Hahn also

14 complained that his counselor "took to [sic] many custody points away." *Id.* In a March 24, 2010

15 letter, Mr. Hahn was informed that his custody score was correct and that an override was not

16 supported. *Id.*, letter from Kevin Bowen, Correctional Specialist 4, dated March 24, 2010 at p.

17 52.

18 On April 26, 2010, plaintiff was assaulted and injured by another inmate at WSP. Dkt.

19 19, pp. 22-52.

20                    II.    DISCUSSION

21 Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that

22 there is no genuine issue as to any material fact and that the moving party is entitled to judgment

23 as a matter of law. Federal Rule of Civil Procedure ("FRCP") 56(c). In deciding whether

24

25

REPORT AND RECOMMENDATION - 8

summary judgment should be granted, the Court "must view the evidence in the light most favorable to the nonmoving party," and draw all inferences "in the light most favorable" to that party. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). When a summary judgment motion is supported as provided in FRCP 56, an adverse party may not rest upon the mere allegations or denials of his pleading, but his or her response, by affidavits or as otherwise provided in F.R.C.P. 56, must set forth specific facts showing there is a genuine issue for trial. FRCP 56(e)(2).

If the nonmoving party does not so respond, summary judgment, if appropriate, shall be rendered against that party. *Id.* The moving party must demonstrate the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude summary judgment. *California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." *T.W. Electrical Serv.*, 809 F.2d at 630.

Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of summary judgment." *Id.* Rather, the nonmoving party "must produce at least some 'significant probative evidence tending to support the complaint.'" *Id.* (quoting *Anderson*, 477 U.S. at 290).

A. <u>Plaintiff Fails to Establish Personal Participation on the Part of Defendants Waddington and Russell</u>

Mr. Hahn has named Doug Waddington and Scott Russell as defendants in this matter, both of whom Mr. Hahn states are or had been the Superintendent of WCC at the time of the

1  events in question.

2      To establish Section 1983 liability for damages, a plaintiff must show the defendants, acting under color of state law, personally participated in the alleged deprivation of federal constitutional or statutory rights. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). More specifically, the plaintiff must allege the defendants, through their own individual actions, violated those rights. *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1069 (9th Cir. 2012).

    Government officials, however, "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 566 U.S. 662, 676 (2009). Thus, "[b]ecause vicarious liability is inapplicable to" suits brought pursuant to 42 U.S.C. § 1983, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violation the Constitution." *Id.* (emphasis added); see also *Peralta v. Dillard*, 744 F.3d 1076, 1085 (9th Cir. 2014) ("Supervisors aren't vicariously liable for constitutional violations under section 1983. But they can be liable for their own conduct.") (internal citation omitted).

    Mr. Hahn does not set forth any facts in his complaint, nor has he come forth with any evidence to show, that either Mr. Waddington or Mr. Russell acted other than in their supervisory capacities in regard to any of the harms alleged. Indeed, the only context in which Mr. Hahn addresses Mr. Waddington's and Mr. Russell's alleged participation is solely in their role as Superintendent responsible for those under their supervision. *See* Dkt. 19, pp. 5-6, 13. As such, Mr. Hahn's claims against them fail.

B.    <u>Plaintiff Fails to State a Valid Eighth Amendment Claim</u>

    "[T]he Eighth Amendment prohibits punishments which . . . involve the unnecessary and wanton infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Gregg v.*

*Georgia*, 428 U.S. 153, 173 (1976)). "What is necessary to establish an 'unnecessary and wanton infliction of pain,'" however, "varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)).

To assert a valid Eighth Amendment claim, an inmate must show "for each defendant" prison official that he or she had "a 'sufficiently culpable state of mind.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Brock v. Wright*, 315 F.3d 158, 162 (2nd Cir. 2003). "[T]hat state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834; *see also Hudson*, 503 U.S. at 5; *Gamble*, 429 U.S. at 105.

While it is "more blameworthy than negligence," deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835 ("Eighth Amendment liability requires 'more than ordinary lack of due care for the prisoner's interests or safety.'") (quoting *Whitley*, 475 U.S. at 319). Rather, "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer*, 511 U.S. at 836. "Recklessness" occurs if "prison officials disregard a substantial risk of danger that is known or would be apparent to a reasonable person in the prison official's position." *Starbeck v. Linn County Jail*, 871 F.Supp. 1129, 1144 (N.D. Iowa 1994).

A prison official, accordingly, will not be found deliberately indifferent, "unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. That is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

"[A]n official's failure to alleviate a significant risk that he should have perceived but did

not," therefore, "cannot . . . be condemned as" deliberate indifference. *Id.* at 838. "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Toguchi v. Soon Hwang Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (quoting *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002)).

"This 'subjective approach'" thus "focuses only 'on what a defendant's mental state actually was,'" although deliberate indifference "may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." *Toguchi*, 391 F.3d at 1057 (quoting *Farmer*, 511 U.S. at 839; *Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003)); *see also Brock*, 315 F.3d at 164 ("[E]vidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it.").

The subjective approach also requires the plaintiff to present facts from which it could be found that the relevant government official knew of the risk, "but intentionally or recklessly disregarded it." *Hayes*, 546 F.3d at 523. That is, the plaintiff must show the official's actions "were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Id.* at 524.

Mr. Hahn asserts that while he did not know who would attack him, he "just knew that he was going to be attacked." Dkt. 104, p. 5. Mr. Hahn further asserts that he warned Mr. Martin of this fear, that Mr. Martin "looked into it," and then without asking him any more questions Mr. Martin "decided that [his] fears and concerns were not viable or credible." *Id.* Mr. Hahn goes on to assert that "WSP is known for its violence," and that Mr. Martin "never asked him about any fears or concerns regarding placement options," even though his job description requires him to

1  do so. Dkt. 104, p. 5 (citing Dkt. 105-1, Exhibit F, pp. 18-21).

2  Mr. Hahn additionally asserts that Classification Counselors classify and put inmates in
3  for a certain facility. *Id.* at p. 6. Lastly, Mr. Hahn asserts Mr. Martin "was put on notice through
4  the numerous complaints [he] made to Mental Health counselors," which Mr. Martin could have
5  discovered by conducting a thorough investigation. Dkt. 104, p. 6.

6  As noted above, however, Mr. Hahn must not only show that Mr. Martin was aware of
7  the facts from which the inference could be drawn that a substantial risk of serious harm to him
8  existed, but that Martin actually drew that inference. *Farmer*, 511 U.S. at 837. Mr. Hahn has
9  failed to do so.

10  The record does not support plaintiff's assertion that he warned Mr. Martin that he faced
11  a serious risk of harm if sent to WSP. Despite the assertions Mr. Hahn makes in his response to
12  defendants summary judgment motion, there is no evidence that Mr. Hahn informed Mr. Martin
13  any time during the interview or information gathering process of such a fear. Rather, the many
14  Kiosk messages he sent Mr. Martin reveal that to the extent he had specific concerns regarding
15  his health or safety if placed at WSP, those concerns were not communicated to Martin at least to
16  the extent that Mr. Martin could be said to in fact know of them.

17  Mr. Hahn claims the Kiosk email he sent to Mr. Martin on December 28, 2009, stated
18  that he did not want to be sent to WSP, but as noted above that message actually states "TO
19  WALLAWALLA WHEN I SEE YOU SOON I WILL EXPLAIN WHY." Dkt. 19, p. 18. The
20  very next day, furthermore, Mr. Hahn again emailed Mr. Martin stating: "JUST SEND ME
21  ANYWHERE." *Id.*

22  While it is true Mr. Hahn did also state in that second email that he had "QUESTIONS
23  AND A CELLY REQUEST" (*id.*), there is no evidence any such questions or request concerned

REPORT AND RECOMMENDATION - 13

any fears Mr. Hahn had in regard to being sent to WSP. While it is also true that Mr. Hahn told Mr. Martin on December 22, 2018, that "WSP WILL NOT WORK," again there is no indication in that email message the reason for why it would not work. Dkt. 19, p. 18.

Likewise, the concerns Mr. Hahn expressed in his December 18, 2009 letter to the DOC Headquarters' Classification Unit merely references "inappropriate questions" by Mr. Martin, assumptions Mr. Martin made, and an allegation that Mr. Martin did not allow him to answer the questions he was asked. Dkt. 94, p. 49. Again, though, there is indication in that letter that Mr. Hahn had communicated any specific safety concerns to Mr. Martin.

More problematic for Mr. Hahn is that he also complained in that letter that his concern about being sent to WSP was because it was too far away from where his family lived. *Id.* Once more, there is no mention of any safety concerns. Later that month, Mr. Hahn did indicate to Mr. Martin that he had concerns about being housed with another inmate, but there is no indication what the concerns plaintiff had were. Dkt. 19, pp. 18-19. Nor did Mr. Hahn ever respond to Mr. Martin's request for further information regarding those concerns. *Id.*

Kiosk email records reveal that subsequent correspondence between Mr. Hahn and Mr. Martin made no mention of safety concerns. *See* Dkt. 19, pp. 18-19. Thus, although Mr. Hahn disputes Mr. Martin's statement that he never expressed any concerns for his safety, Mr. Hahn offers nothing more than his assertions that he informed Mr. Martin of such. Further, even if it is true that Mr. Hahn told Mr. Martin about the January 15, 2010 incident in which Mr. Hahn states he was slashed on the lip by another inmate, by his own admission Mr. Hahn did not tell Mr. Martin about this until January 27, 2010, seven days after the Headquarters' Classification Unit assigned him to close custody at WSP. Dkt. 19, p. 8; Dkt. 88, p. 5.

As to plaintiff's assertion that he told a "Mental Health prescriber" on January 12, 2010,

1  that he "was scared to go to Walla Walla," even if true, there is no indication that Mr. Martin was

2  at all aware of this. Dkt. 19, p. 8. The same is true in regard to the similar comments Mr. Hahn

3  made to the Psychology Associate A Kohl LFT on February 1, 2010. Dkt. 95, p. 36.

4       Mr. Hahn asserts that as a Classification Counselor, Mr. Martin had the duty to inquire as

5  to any fears or concerns Mr. Hahn may have had. But the job description Mr. Hahn provides for

6  that position makes no mention of such a requirement. *See* Dkt. 105-1, Exhibit F, pp. 18-21. Nor

7  does that description state or otherwise indicate that a Classification Counselor classifies and

8  puts inmates in for a certain facility as Mr. Hahn also asserts. See *id.* Rather, as discussed above,

9  Classification Counselors do not make facility placement decisions, and the record clearly shows

10  Mr. Martin did not make that decision for Mr. Hahn.

11       Mr. Hahn's March 4, 2010 letter, in which he states that "being at Walla Walla is not the

12  issue, being in close custody is" (Dkt. 19, p. 9), casts even more doubt on the truth of Mr. Hahn's

13  claims. Indeed, fear or concern for safety does not appear to be the issue, but rather the fact that

14  he was "around a lot of lifers and murderers and convicts," and hat he believed he was not one of

15  them. Dkt. 94, p. 53.

16       Mr. Hahn has not provided sufficient evidence of any facts that would support an Eighth

17  Amendment cruel and unusual punishment claim. Nor has the plaintiff shown that any such facts

18  were made known to Mr. Martin or of which Mr. Martin could or should have been aware. For

19  all of the foregoing reasons, Mr. Hahn's Eighth Amendment claim thus fails.

20       C.    <u>Defendant Martin Is Entitled to Qualified Immunity</u>

21       Qualified immunity shields government officials from money damages, unless the

22  plaintiff "pleads facts showing (1) that the official violated a statutory or constitutional right, and

23  (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-*

24

25

1  *Kidd*, 563 U.S. 731, 740 (2011) (quoting *Harlow*, 457 U.S. at 818). The Court must determine

2  whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged

3  show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201

4  (2001).

5      As to the question of "clearly established law", an official's conduct "violates clearly

6  established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are]

7  sufficiently clear' that every 'reasonable official would have understood that what he is doing

8  violates that right.'" *al-Kidd*, 131 U.S. at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635,

9  640 (1987)). The burden is on the plaintiff to show that the statutory or constitutional right that

10 plaintiff claims was allegedly violated was a clearly established right under law that existed at

11 the time of the alleged acts or omissions. *Shafer v. County of Santa Barbara*, 868 F.3d 1110,

12 1118 (9th Cir. 2017).

13     As discussed above Mr. Hahn has failed to demonstrate that Mr. Martin violated his

14 Eighth Amendment rights – let alone show that any such rights were clearly established – Mr.

15 Hahn's claims against Mr. Martin should be dismissed on the basis of qualified immunity as

16 well.

17                                                    <u>CONCLUSION</u>

18     Plaintiff has failed to establish personal participation on the part of defendants

19 Waddington and Russell. As such, all claims against those defendants should be dismissed with

20 prejudice. Plaintiff also has failed to state a valid Eighth Amendment claim against defendant

21 Martin, and therefore defendant Martin is entitled to qualified immunity. Accordingly, all claims

22 against defendant Martin should be dismissed with prejudice as well.

23     The undersigned therefore recommends the Court GRANT defendants' motion for

24

25

REPORT AND RECOMMENDATION - 16

1  summary judgment (Dkt. 85) and DISMISS plaintiff's complaint with prejudice.

2  The parties have **fourteen (14) days** from service of this Report and Recommendation to

3  file written objections thereto. 28 U.S.C. § 636(b)(1); FRCP 6; FRCP 72(b). Failure to file

4  objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474

5  U.S. 140 (1985). Accommodating this time limitation, this matter shall be set for consideration

6  on **September 7, 2018**, as noted in the caption.

7  Dated this 21st day of August, 2018.

*Theresa L. Fricke*
Theresa L. Fricke
United States Magistrate Judge